UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JUDY GOFFMAN CUTLER,

                                        Plaintiff,

                                                                07 CV 3807 (LAP)

            - against -

ART LOSS REGISTER, INC. and
JACK SOLOMON,

                                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## DECLARATION OF CHRISTOPHER A. MARINELLO, ESQ.

1.      I am an attorney, duly admitted to practice law in the State of New York. I am
general counsel at the Art Loss Register (hereinafter "ALR"), which has been named as a
Defendant in this action. I submit this declaration in support of the application by ALR for an
order dismissing the Amended Complaint against it.

2.      Plaintiff is allegedly an art dealer residing in the State of Rhode Island (Complaint
¶ 4). Defendant Jack Solomon (hereinafter "Solomon") is a resident of the State of Nevada
(Complaint ¶ 5).

3.      This action involves a painting by the renowned artist Norman Rockwell entitled
*The Russian Schoolroom*, 1967, oil on canvas, 16 inches x 37 inches (hereinafter the "Painting").
It is my understanding that Solomon purchased the Painting in 1968.

4.      In 1973 the Painting was stolen from an art gallery in Missouri (Complaint ¶ 10
and ¶ 1). It is my understanding that the Painting is currently in the possession of Steven
Spielberg in the State of California.

5.      As acknowledged in the Complaint, the ALR maintains a private database of lost
and stolen art that assists art collectors, the art trade, insurers, and worldwide law enforcement
agencies in the effort to effectuate the recovery and return of stolen art to the rightful owner
(Complaint ¶ 7). ALR was established in London, England in 1991. Its founding shareholders

1

(Complaint ¶ 7). ALR was established in London, England in 1991. Its founding shareholders included major businesses from both the insurance and art industries. ALR maintains an international database of lost and stolen art, antiques and collectables that currently contains detailed descriptions of more than 170,000 unrecovered, stolen works. Through this database and the checking searches it conducts on request (currently at the annual rate of 300,000), ALR acts as a significant deterrent to the theft of art. ALR also operates a recovery service which facilitates the return of stolen works to their rightful owners. To date, ALR has since been responsible for the recovery of over $150 million of stolen art and antiques.

6.      Stolen works of art become registered in the database in a number of ways but one frequent source of registration is law enforcement agencies. With regard to the Painting, it was registered with ALR as a stolen work by the Federal Bureau of Investigation (hereinafter "FBI") on December 2, 2005.

7.      According to the Complaint, the FBI contacted Cutler "in late 2006" and informed her that the FBI was pursuing the whereabouts of the Painting (Complaint ¶ 27).

8.      It is my understanding that sometime between February 26 and March 1, the FBI received a call from a representative of Steven Spielberg who informed the FBI that Mr. Spielberg was in possession of the Painting (having noticed an alert on the FBI's website). According to the Complaint (¶ 27) "in early 2007", Plaintiff was also contacted by a representative of Spielberg who allegedly "reminded" Plaintiff that the Painting being pursued by the FBI was the same Painting that she had sold to Spielberg in 1989.

9.      On March 2, 2007, the United States Department of Justice announced that the FBI had "located" the Painting in Los Angeles in the possession of Mr. Spielberg. The announcement referred to the Painting as being stolen property. The announcement concluded with the statement "The investigation is continuing". A copy of this announcement is annexed hereto as Exhibit A.

2

10.    The ALR first learned that the Painting might have been recovered on March 1, 2007 when a reporter from the St. Louis Post Dispatch called seeking information that the ALR might have on this situation. On March 2, Katie Dugdale in our office wrote to the FBI (to Bonnie Magnus-Gardener) to ask for confirmation. On March 5, 2007, Ms. Dugdale received that confirmation including the fact that the Painting had been recovered in the collection of Mr. Spielberg.

11.    The same day (March 5), I wrote to Ms. Magnus-Gardener and asked for guidance on how to respond to any calls that I might receive asking for information. I was directed to refrain from discussing the matter and to refer all inquiries regarding the "details" of the matter to the St. Louis office of the FBI. A copy of this email from Ms. Magnus-Gardener is attached as Exhibit B.

12.    Either on or shortly after March 5, 2007, a telephone call was referred to me and I spoke to a woman who did not identify herself but who later turned out to be Plaintiff. She asked me several general, academic questions about the process of registering a stolen work with ALR. At no time did she ever make any reference to this particular matter. I recall receiving at least one more similar telephone call from the same person (without any reference to this situation).

13.    Following these anonymous calls, I had one telephone conversation with Plaintiff in which she identified herself as the art dealer that had sold the Painting to Mr. Spielberg. It was recognized in our conversation that she had been the same person who had previously called on an anonymous basis. I recall particularly that Plaintiff wanted me to tell her the date when the Painting had been registered as stolen with the ALR. I told Plaintiff that I could not discuss the matter with her because it was the subject of an open FBI investigation (per the instructions given to me by Ms. Magus-Gardener). This was my one and only communication with the Plaintiff in which I was aware that she was the person who had sold the stolen Painting to Mr. Spielberg.

3

14.     On March 14, 2007, I received a call from Martin Bressler who identified himself as the attorney for Plaintiff. Like the Plaintiff, Mr. Bressler was principally seeking the date when the Painting had been registered as stolen with the ALR. In this conversation and in a telephone conversation the next day, Mr. Bressler elaborated on reasons why the theft victim, Solomon, should be precluded from asserting his rights as the true owner. I repeatedly indicated to Mr. Bressler that I was not at liberty to discuss any details concerning this matter. As it fortuitously turns out, Mr. Bressler sent me an email on March 15 in which he confirmed the two conversations that we had on March 14 and 15. A copy of that email is annexed as Exhibit C. It clearly indicates that I simply told him that I was not at liberty to discuss the facts of the matter. There is nothing in Mr. Bressler's lengthy confirmation of our conversation about any threats by me, either directly to his client or to him, concerning the FBI or otherwise. On March 19, I received another email from Mr. Bressler urging me to discuss this matter further with him. I responded to that email by telephone and simply reminded Mr. Bressler that I was not at liberty to discuss the matter with him because of an ongoing FBI investigation. This is all I said about the FBI.

15.     Mr. Bressler wrote back after that telephone call to say that he had called an FBI agent (Jim Wynne) who purportedly told him that the FBI was not preventing me from discussing the matter with Mr. Bressler. I promptly replied that this directive had come not from Agent Wynne or any other field agent but rather from Washington D.C. (i.e. Ms. Magnus-Gardener). Copies of this email correspondence with Mr. Bressler is attached as Exhibit D.

16.     Against this clear and documented background, the Complaint states that on or about March 20, 2007 I "threatened" Plaintiff "that if she did not settle Solomon's claim by returning the work to him, she would suffer criminal prosecution because she had lied to the FBI and would as well do damage to her reputation". (Complaint ¶ 29).

4

17.     This alleged communication never took place. Following my refusal to discuss the details of this matter, Mr. Bressler sought to have a meeting at which he could further endeavor to convince me that Solomon was not entitled to repossess the Painting notwithstanding the fundamental legal principle that a thief cannot pass good title (nor can anyone thereafter acquire good title, which remains with the owner of the property at the time of the theft). I agreed to meet with him and this next exchange between us (other than scheduling) occurred on Friday, April 27, 2007.

18.     Thus there was no communication between me and Mr. Bressler from March 19, 2007 to April 27, 2007 except for the effort to schedule a meeting. At the meeting on April 27, 2007 (which included Plaintiff's husband), Mr. Bressler principally presented his client's position on the issue of ownership. I advised him that it was my understanding that since the Painting was initially stolen, Mr. Solomon remained the rightful owner and that the facts proffered by Mr. Bressler were insufficient to alter that legal conclusion. I made it clear to Mr. Bressler that I thought that the matter should be ultimately resolved by a return of the Painting to its rightful owner, Mr. Solomon. At this meeting I made no threats regarding the FBI or otherwise and there is no specific allegation in the Complaint which could be construed to convey any such threat.

19.     The correspondence that immediately followed the meeting also belies any allegation that I threatened or coerced the Plaintiff. Annexed hereto as Exhibit E is the communication I had with Mr. Bressler directly following the meeting and capturing the essence of that event. Had there been the malicious coercion decried in the Complaint, it certainly would have been noted.

20.     At the conclusion of our meeting on April 27, 2007, we discussed having another meeting. Since the sole purpose of any follow up meeting would have been to seek a solution to the impasse or disagreement between Plaintiff and Solomon, I decided to check with the FBI to

see whether it was still investigating the matter and whether any ongoing investigations would preclude or affect any settlement between Plaintiff and Solomon. In a telephone conversation with the FBI agent who was in charge of this matter for the FBI, I was told that the matter was still under investigation. This agent further imparted displeasure and concern about statements that had been made to the FBI by the Plaintiff. As soon as I hung up with the FBI agent, I wrote an email to Mr. Bressler simply imparting the information that I had just received in the form of a question. This email is selectively quoted in the Complaint in ¶ 30 and is annexed hereto in its entirety as Exhibit F. Mr. Bressler promptly responded to this email, asking me to detail any "misstatements" that Plaintiff may have made to the FBI. But being unaware of the details and being unwilling to engage in some extraneous exercise with Mr. Bressler along these lines, I refused to proceed with that discussion. This exchange is included in Exhibit F.

21.     This email that I sent on May 1, 2007 (incorrectly dated May 2, 2007 in the Complaint) is the only specific instance in which I allegedly made an actionable statement.

22.     The two questions that I asked Plaintiff's attorney on May 1, 2007 regarding the ongoing FBI investigation were innocuous and by no means coercive. The questions made no reference to criminal prosecution. The questions threaten nothing on the part of the ALR or anyone for that matter. The questions were not raised with any malicious intent and under no stretch of even the alleged facts could it ever be demonstrated that I was solely motivated by malice or disinterested malevolence. Indeed, the Complaint even lacks the necessary allegation that there was a singular intent to injure. Moreover, I had every reason to ask these questions since they had bearing on the ability of Solomon and the Plaintiff to enter into a settlement that affected the ownership and/or possession of the Painting. And there is no allegation (nor could there be) that Plaintiff suffered some actual pecuniary loss from these two questions being put to her attorney.

6

23.    Not only do I deny ever threatening the Plaintiff, the correspondence produced herewith indicates that no such threat occurred as alleged in the Complaint.

24.    In addition to the failure to plead the necessary elements to a so-called claim for intentional tort or a claim for prima facie tort, several pertinent points should be noted in connection with the allegation of misconduct in ¶ 29 of the Complaint: i) I had only one communication with Plaintiff in which I was aware that the Plaintiff was the person who had sold the stolen Painting to Mr. Spielberg and in that conversation, I simply told the Plaintiff that I could not discuss the facts with her; ii) I could not have possibly demanded that Plaintiff return the Painting to Mr. Solomon because I knew that the Painting was in the possession of Mr. Spielberg who believed himself to be the owner at least up to the point at which he learned that the Painting had been stolen; and iii) I have absolutely no control over the FBI or the Department of Justice, and therefore I was in no position to credibly state (even if I wanted to) that Plaintiff would "suffer criminal prosecution" for any reason.

25.    I submit that this is a dispute between a citizen of Rhode Island and a citizen of Nevada that is being handled for the Plaintiff by a New York lawyer who would like to pursue his client's position in a New York court. Hence the claim against ALR was invented to provide a New York nexus for this lawsuit. The Complaint against ALR is totally without merit and fails as a matter of law to state a claim even based on the allegations in the Complaint.

26.    Accordingly, I respectfully request that the Amended Complaint be dismissed against ALR.

I declare under penalty of perjury that the foregoing is true and accurate.

Christopher A. Marinello, Esq.

Executed on July 24, 2007

7

**EXHIBIT A**

Case 1:07-cv-03807-LAP    Document 7    Filed 07/31/2007    Page 9 of 21
Federal Bureau of Investigation - St Louis Field Division - Press Release - Department of ...    Page 1 of 2
Case 2:07-cv-00645-RLH-PAL    Document 11    Filed 07/11/2007    Page 21 of 22



# Department of Justice

UNITED STATES ATTORNEY'S OFFICE
EASTERN DISTRICT OF MISSOURI
CATHERINE L. HANAWAY
United States Attorney

NEWS RELEASE

For further information: Call Public Affairs Officer Jan Diltz at (314) 539-7719

March 2, 2007
For Immediate Release

### NORMAN ROCKWELL PAINTING STOLEN IN MISSOURI IN 1973 FOUND IN LOS ANGELES

*St. Louis* - Agents with the Federal Bureau of Investigation's Art Crime Team (ACT) have located an original Norman Rockwell painting, *Russian Schoolroom*, stolen during a late night burglary in Clayton, Missouri in June 1973, announced Roland J. Corvington, Special Agent in Charge of the FBI's St. Louis, Missouri, Field Office and J. Stephen Tidwell, Assistant Director in Charge of the FBI's Los Angeles Field Office.

At the time of theft, the painting was part of a Norman Rockwell Exhibit being sponsored by the Chicago's Circle Galleries, now known as Arts International Galleries. At the time of the theft, the *Russian Schoolroom*, oil on canvas, measured 16" X 37", and was presented in a 2' x 4' frame of dull gold-white molding. This painting is also referred to as The *Russian Classroom* or *Russian Schoolchildren*. Records for the *Russian Schoolroom* indicate that the painting's location was unknown between 1973, after the theft, and 1988. In October 1988, *Russian Schoolroom* was sold at auction in New Orleans, Louisiana. In 2004, Agents with the FBI's ACT determined the painting had been advertised for sale at a Norman Rockwell exhibit in New York in 1989.

Acting on this information, the FBI's ACT in St. Louis initiated a "cold case" investigation to locate and recover the *Russian Schoolroom*. Investigative leads were followed by FBI Agents in New York and Los Angeles Field Offices to identify the current whereabouts of the painting. A description and photograph of the painting was posted on the FBI's Art Crime Team's website at www.fbi.gov. While the FBI's ACT were following leads to find the painting, the staff of motion picture Director and Producer, Steven Spielberg, learned that the painting, which was in Mr. Spielberg's collection, was stolen after they viewed an FBI theft notice. Mr. Spielberg's staff immediately used art market channels to bring the painting's current location to the FBI's attention. Mr. Spielberg purchased the painting in 1989 from a legitimate dealer and did not become aware that it was a stolen work of art until last week. The Los Angeles-based ACT agent and an art expert from the Huntington Library in Pasadena, California, inspected the painting and determined the painting's authenticity this morning. Mr. Spielberg is cooperating fully with the FBI and will retain possession of the *Russian Schoolroom* until its disposition can be determined. The investigation is continuing.

For more information about the FBI's Art Crime Team and stolen paintings, visit the FBI's website at www.fbi.gov/hq/cid/arttheft/arttheft.htm.

**EXHIBIT B**

-----Original Message-----
From: bmagness@leo.gov [mailto:bmagness@leo.gov]
Sent: Monday, March 05, 2007 1:35 PM
To: Chris Marinello
Subject: Re: Speilberg case

Chris,

I think if you get questions about the details of the case, refer them to the St. Louis office, Pete Krusing, (314) 231-4324.  Call Denise Ballew (202) 324-3277, for National Art Crime Team Art Theft Program questions.

Thanks!

Bonnie

Bonnie Magness-Gardiner
FBI Art Theft Program Manager
(202) 324-6668
bmagness@leo.gov

**EXHIBIT C**

**From:** Bresslaw@aol.com [mailto:Bresslaw@aol.com]
**Sent:** Thu 3/15/2007 2:53 PM
**To:** Chris Marinello
**Subject:** (no subject)

Dear Chris:     CONFIDENTIAL

It was good talking to you yesterday and today.  I am sure that we can maintain a collegial relationship  in resolving this matter.  I have made my client's position quite clear.  In l989 she openly and notoriously offered the Rockwell work for sale (illustrated in Arts & Antiques magazine)  and ultimately sold it to her client, Steven Spielberg. She acquired it in l988 from an auction house in New Orleans which listed its last provenance as "Circle Galleries".  We both know that auction houses do not disclose names of consignorts and stand behind the implied warranty of title. Thus further inquiry of the auction house would have have taken her no place.On the other hand we know that Jack Solomon was aware that Judy was offering the work for sale and did not inform her that the work had been stolen from his gallery 16 years earlier.

Judy is the largest purveyor of Rockwell works and  her reputation is impeccable. Over the years when she discovered that a work on the market was stolen she reported it immediately. Obviously, it is important, both legally and ethically, that her reputation not be tarnished by unfounded claims.

It is our position that Solomon- and thus Chubb - sat on his hands since 1973 - and did nothing to inform the art world that the Rockwell was stolen.   Indeed, the police record of the theft was "lost" and only recent; discovered. You have said to me that Judy should have known that it was stolen and I have asked you if, as and when the theft was listed on ALR or any other public registry. You have told me that you are not at liberty to disclose that fact.

In ALR's website the following is written:

        " Second, by operating a due diligence service to sellers of art and also being the worldwide focus for any suspicion of illegitimate ownership, the ALR operates a recovery service to return works of art to their rightful owners. In recent years, the service has been extended to negotiate compensation to the victims of art theft and a legitimising of current ownership. "

     Thus I suggest to you that your obligation is not to act mono focused  on behalf of Solomon and Chubb but to carefully weigh the facts and to conclude - as I think you must- that Judy indeed on the facts and the law had good title to pass.  ALR - as it concedes- has a duty to do more than act as an advocate for a client. If everything points to Judy' having the right to pass title-  ALR has an obligation to come to her defense and say so not to take up the cudgels against her which will surely be deleterious to her good name. .


     I hope to speak to you soon.

Martin Bressler

**EXHIBIT D**

**From:** Bresslaw@aol.com [mailto:Bresslaw@aol.com]
**Sent:** Monday, March 19, 2007 2:04 PM
**To:** Chris Marinello
**Subject:** (no subject)

Chris:

There must be some confusion. I spoke to Jim Winn of the FBI office in NY who talked to Frank Brostrom, the FBI agent in charge of the case. Frank told him that he NEVER said that you were forbidden to disclose whatever files you may have on the theft of Russian Schoolroom. You know that Judy steadfastly states that she had no knowledge of the theft until advised by the Spielberg people that the theft showed up on the FBI "Stolen" file appearing on the Internet. It is obviously of some importance to know whether the theft has been listed over the years on your registry or upon IFAR's or AFDAA's registries that were turned over to you. Obviously we cannot have any substantive discussions regarding this matter until this information is revealed. I await your early and hopefully positive response.

Martin Bressler I

**From:** Chris Marinello
**Sent:** Mon 3/19/2007 2:12 PM
**To:** Bresslaw@aol.com
**Subject:** RE: (no subject)

You have your facts wrong. My written request from the FBI did not come from either gentlemen but from the Washington office.
It would appear that you are discussing matters with other individuals that you and I agreed to keep confidential.
Perhaps we should talk.

**EXHIBIT E**

**From:** Bresslaw@aol.com [mailto:Bresslaw@aol.com]
**Sent:** Monday, April 30, 2007 12:09 PM
**To:** Chris Marinello
**Subject:** Rockwell

Chris

Believ3e it or not it was pleasant meeting you the other day.

I received an E-mail from you with two attachments. They were the letter from ALR telling me about the registry of the work and my memo to ALR. Was there more or was it simply mis- sent?

**From:** Chris Marinello
**Sent:** Mon 4/30/2007 12:18 PM
**To:** Bresslaw@aol.com
**Subject:** RE: Rockwell

I intended to e mail you the same certificate that I handed you during our meeting.
I'll try again but you really don't need an e mail version.

I too enjoyed meeting you and your client. He certainly is a charming person with some very interesting contacts.

Chris

**From:** Bresslaw@aol.com [mailto:Bresslaw@aol.com]
**Sent:** Tue 5/1/2007 10:33 AM
**To:** Chris Marinello
**Subject:** (no subject)

Chris:

In our ongoing investigation we discovered that it was not until l994 that Jack Solomon entered into a a non compete agreement- this was at the time that Circle reorganized its business and obtained new investors. This information was gleaned from the `10 K that is available on Google. Apparantly Solomon was still quite active in the business in l989 when Judy sent out a photo of Russian Schoolroom to his company.

Our investigation continues.

Have you discovered whether your people found a record that the ADAA turned over to
ALR information that the Rockwwell was stolen? I know that from l969 to l986 the ADAA used a numbering system to identify the stolen art tha it registered and that it thereafter made its records available to IFAR. One would think that the ADAA records would have shown up in the data base licensed to you by IFAR. Please advise so that both of us can resolve this matter from a position of knowing the facts.

MB

**From:** Chris Marinello
**Sent:** Tuesday, May 01, 2007 11:58 AM
**To:** Bresslaw@aol.com
**Subject:** RE: (no subject)

If Judy sent a photo to the company, did it include a letter inquiring as to the status of the theft?
CM


**From:** Bresslaw@aol.com [mailto:Bresslaw@aol.com]
**Sent:** Tue 5/1/2007 12:48 PM
**To:** Chris Marinello
**Subject:** Re: (no subject)

Chris:

I do not understand your comment.  We know that a work stolen frpom Circle was offered to Circle for sale in l988 at a time before it was sold to Spielberg.  Circle thus had the opportunity to tell Judy that it was stolen at a time before she sold it to an unknowing client and at a time when she could have perhaps gotten her money back from the auctioneer. from whom she purchased it.  Why would Judy offer the work to Circle if she knew that it had been stolen from Circle?  It does not make any sense.  Certainly Judy didn't tell Circle that she fouind the stolen work because she did not know that it was stolen. One might think that the Circle people themselves knowing that a valuable Rockwell work had been stolen from their gallery would have told Judy of the fact>  They did not do so, nor did they take any reasonable steps since l973 to let her and others now that it was stolen.   Not only was Circle specifically offered the stolen work by Judy but in l989 a former emplyee called twice to advise Jack Solomon that Judy was advertising the work for sale.

MB


**From:** Chris Marinello
**Sent:** Tue 5/1/2007 12:57 PM
**To:** Bresslaw@aol.com
**Subject:** RE: (no subject)

I don't agree with your version of the facts.
Nothing I have heard has persuaded me that anyone other than Jack Solomon is the theft victim here.
Nothing I have heard has persuaded me that anyone other than Jack Solomon is entitled to the return of this work.

We are confident that given Judy's conduct or lack of conduct, the courts will rule in our favour.

If you have an alternative to letting the courts decide, I am willing to listen.

We agreed to another meeting, perhaps we should set that up soon.

CM

EXHIBIT F

**From:** Chris Marinello
**Sent:** Tue 5/1/2007 2:00 PM
**To:** Bresslaw@aol.com
**Subject:** RE: (no subject)

It is undisputed that the work was owned by Jack Solomon personally, consigned to his Clayton Gallery and stolen while on exhibit at Arts International.

Let me ask you a question Martin, are you convinced that Judy Cutler has been cleared of all charges in this case? Are you convinced that she has been cleared with respect to her misstatements to Federal Officers?

I am very aware of the strength of our case and our meeting did nothing to weaken it. If you have something to share at this point, it should be in the form of a palatable resolution to the matter. It should be one that entices our client to settle without the time, cost and publicity of litigation.

**From:** Bresslaw@aol.com [mailto:Bresslaw@aol.com]
**Sent:** Tuesday, May 01, 2007 2:09 PM
**To:** Chris Marinello
**Subject:** Re: (no subject)

PLEASE t TELL ME WHAT MISSTATEMENTS JUDY MADE TO THE FBI.  i AWAIT YOUR RESOPONSE BY MY COMPUTER.  .

MB

**From:** Chris Marinello
**Sent:** Tue 5/1/2007 2:13 PM
**To:** Bresslaw@aol.com
**Subject:** RE: (no subject)

I have no intention of trying this case over your computer.

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK )
                   )  ss.:
COUNTY OF NEW YORK )

SALOME M. KRELL, being duly sworn, states:

1.    I am a non-party to this action, over the age of 18 years, having an address

at 161 Avenue of the Americas, New York, New York 100013.

2.    On July 30, 2007 I served the foregoing NOTICE OF MOTION on

counsel for all parties by FEDERAL EXPRESS to the following:

> Martin Bressler
> Attorney for Plaintiff
> 349 D Heritage Hills
> Somers, New York 10589
>
> Michael R. Mushkin
> MUSHKIN & HAHER
> Attorneys for Defendant, Jack Solomon
> 4475 S. Pecos Road
> Las Vegas, Nevada 89121

Salomé M. Krell

Sworn to before me this
30th day of July, 2007

Notary Public

JOHN B. KOEGEL
NOTARY PUBLIC, State of New York
No. 02KO4705858
Qualified in New York County
Commission Expires Sept. 30, 2009