UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

JUDY GOFFMAN CUTLER,                           07 CV 3807 (LAP)
          Plaintiff,

                                                                                          AMENDED
V  .                                           COMPLAINT

ART LOSS REGISTER, INC and JACK SOLOMON
          Defendants

-----------------------------------------------------------x

      Plaintiff, Judy Goffman Cutler ("Goffman") by her attorney, Martin Bressler, as and for her complaint alleges:

## I. INTRODUCTION

      1. In March 2007, defendant, Jack Solomon ("Solomon") demanded return from plaintiff, Judy Goffman Cutler ("Goffman") a work of fine art created by the late Norman Rockwell, entitled " the Russian Schoolroom" (The "Work") which unbeknownst to Goffman was stolen in 1973 from a gallery owned by Solomon and purchased in 1988 at auction by Goffman, an art dealer, who sold it the next year, still not knowing that it had been stolen sixteen years before.  Upon information and belief, the Work had been consigned to the Solomon owned gallery by Solomon himself.

      2. From 1973 until 2005 (the date the work was listed on the FBI website for Stolen Art), Solomon did nothing to notify the world, in general, and plaintiff, in particular, of such theft, although in 1988 Solomon became aware that Goffman had purchased the painting at

1

auction.

## II. JURISDICTION

3. Plaintiff seeks a declaratory judgment, in addition to other remedies, because defendants have challenged her acquisition of legal title in the Work which she subsequently sold. There is diversity of citizenship and the matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. 1332. Jurisdiction also lies pursuant to the provisions of 28 U.S.C. 1367 and 2201.

## III, FACTS

A. Parties.

4. Plaintiff, Goffman, is a resident of the State of Rhode Island. She is an art dealer specializing in the sale of works of fine art created by American illustrators, such as Norman Rockwell ("Rockwell"). Goffman for all times relevent herein conducted her business either under as Judy Goffman or as Judy Goffman Fine Art. She has been an art dealer for over forty years and has established a reputation as one of the premier dealers of American illustration art. Over the years Goffman has sold over 300 original works by Rockwell.

5. Upon information and belief, defendant " Art Loss Register, Inc. ("ALR") is a corporation incorporated under the laws of the State of New York. With offices in New York City, and upon information and belief defendant Solomon is a resident of the State of Nevada.

2

6. Upon information and belief, defendant Solomon, has from 1971 through 1996 operated largely family-owned art galleries throughout the United States under the umbrella of Circle Fine Art Corporation of Illinois, specializing in the sale of editions of multiple original art prints. From 1971 through 1976 Solomon was the exclusive publisher of such prints created by Rockwell. In 1996 Circle filed for bankruptcy under chapter 11 of the Bankruptcy Code pursuant to which all of its art holdings were liquidated. The schedule of assets of the Bankrupt did not include a reversionary right purportedly granted to Solomon by his insurance carrier which he asserts permits him to seek return of the Work.

7. Defendant ALR, a for-profit company, represents Solomon to retrieve the Work. It maintains a data-base of stolen works of art and describes itself on its website as follows:

> "The ALR was first established in London in 1991. Its founding shareholders included major businesses from both the insurance and art industries. Subsequently offices in New York, Cologne and recently Delhi have been established so as to cater for an expanding number of searches made on the database.
>
> The ALR is now the world's largest private database of lost and stolen art, antiques and collectibles. Its range of services includes item registration, search and recovery services to collectors, the art trade, insurers and worldwide law enforcement agencies.....Second, by operating a due diligence service to sellers of art and also being the worldwide focus for any suspicion of illegitimate ownership, the ALR operates a recovery service to return works of art to their rightful owners. In recent years, the service has been extended to negotiate compensation to the victims of art theft and a legitimising of current ownership."

8. ALR, in one instance of the discovery of stolen art, in which it was involved, set forth it approach to the purchase of stolen art. It's chairman, Julien Radcliffe is quoted in the Boston Globe (September 30, 1995) that "Until we know more about how they [the

purchasers of the stolen paintings] gained these paintings we have to assume that ...[the purchaser] knew they were stolen when they bought them, or worse, knows who stole them..." adding that "if [we] learn that they [purchaser of the stolen art] are legitimate people who gained these paintings through no untoward means, we are willing to step aside."

9. Upon discovering a stolen work and its recapture "to its rightful owners," ALR is usually paid by retaining a portion of the proceeds - usually 10 to 20% - from the subsequent sale of the recaptured work at auction. Upon information and belief, ALR and Solomon have agreed to such arrangement in the event the Work is recaptured by ALR.

B. <u>The Theft</u>

10. On June 24, 1973 the Work was stolen from the Arts International Gallery, a Circle Arts gallery, in Clayton, Missouri. Upon information and belief, prior to the theft it had been sold by the gallery for $20,000, but the new owner permitted it to remain on exhibition. The theft was reported to police but according to the FBI, the police report was supposedly mislaid and "authorities at the time were unable to locate the original police report to confirm the painting had ever been stolen". According to the FBI, the Police Report has recently been located. The Police Report noted that Arts International, together with the Work's purchaser were co-victims of the theft. Mr Solomon was not so listed.

4

11. Upon information and belief, Solomon did not file a UCC 1 Statement covering consignment of the Work to International Arts, nor did he take any other steps required by Missouri law to retain rights in the Work superior to the gallery's creditors.

12. Upon information and belief, the purchaser of the Work was refunded the purchase price and the sale of the Work to him was rescinded with Arts International being paid $25,000 by the insurance carrier, as the value of the Work. Solomon asserts that he has obtained the right from the carrier to recapture the Work on his own behalf.

C. <u>Solomon's Failure to Notify the Public of the Theft</u>

13. Upon information and belief, from 1973 through 2007, Solomon took no steps to list the Work as stolen upon registries of stolen art available for public inspection, to wit: International Foundation of Art Research ("IFAR") registry; defendant ALR registry and, upon information and belief, the registry operated by the Arts Dealers Association of America ("ADAA"). It was first listed in 2005 upon an FBI website dedicated to notification of stolen art.

14. Solomon, had other opportunities to advise the public of the theft but failed to avail himself of them. For example, in 1986, prior to Goffman's purchase, The Norman Rockwell Museum, after 10 years of research caused the <u>Definitive Catalogue of Norman Rockwell</u> works to be published. It placed advertisements in journals and wrote letters to all those who dealt in, or collected works by Rockwell to locate and identify his works for the <u>Definitive Catalogue of Norman Rockwell</u>. In a number of cases works that had been

5

stolen were listed as "stolen" in the catalogue. If there were no response to the public inquiry the location of a Rockwell was listed as "whereabouts unknown". Solomon did not advise The Rockwell Museum that the Work was stolen and the location of the Work was therefore listed as "Whereabouts Unknown" in the <u>Definitive Catalogue</u>.

D.  <u>The Reappearance of the Work in 1988</u>

15. From the date of the theft in 1973 until 1988, there was no information available to the public as to the whereabouts of the Work. On October 28, 1988, Morton Gallery in New Orleans, conducted the "1988 Annual Louisiana Purchase Auction" at which the Work was offered for sale. It was purchased by Goffman for $70,400. The cover of its catalogue contained a full page reproduction of the Work. Circle Gallery, which had a branch in New Orleans, is listed in the auction catalogue's recital of provenance for the Work as its last owner. Upon information and belief the auction catalogue was widely distributed as part of a substantial promotion of the auction including all dealers in Rockwell works.

16. Upon information and belief, the FBI was aware in 1988 that the Work was offered for sale at auction by the Morton Gallery, and purchased by Goffman, but did nothing because the police report of the theft could not be located.

E.  <u>Goffman's Due Diligence prior to Purchase</u>

17. Prior to her purchase of the Work, Goffman communicated with The Norman

6

Rockwell Museum, the seat of information on the whereabouts to obtain whatever information it had regarding the the Work. As noted above, the whereabouts of the Work was listed in the catalogue as "Whereabouts Uknown." She further checked the provenence of the Work as recited in the auction catalogue, which stated that its prior owners were Circle Gallery and before that the Dannenberg Gallery, Rockwell's exclusive gallery at one time. Goffman's due diligence was equal to or greater than the industry standard at the time for vetting the status of works of art by a potential purchaser.

F. Goffman's Promotion of The Work

18. Upon purchase of the Work, Goffman placed it into a traveling exhibition and promoted the fact that it was for sale. One of the venues, was an art museum in Peoria, Illinois, near Chicago, the location of Circle's mother gallery. The final venue was New York City, where it was exhibited at the World Financial Center, and thereafter at Goffman's gallery. Circle had its own gallery in New York City at that time. The Work was reproduced in an advertisement for the New York exhibition in Antiques magazine and other art journals.

19. A 1989 review of the exhibition mounted by Goffman, entitled Norman Rockwell, The Great American Storyteller, in the Antiques and the Arts Weekly included a reproduction of the Work..

20. Goffman's possession of the Work was widely known. An article in The Maine

7

<u>Antique Digest</u> - a widely distributed trade journal - dated January, 1989, stated that "The sale's [the Louisiana Purchase Auction] most exciting painting was... Russian Schoolroom...." And it was purchased by "New York City dealer, Judy Goffman.."

### G. Solomon's Awareness in 1988-1989 of Goffman's Possession of the Work

21. Solomon was aware that Goffman acquired the Work in 1988 and did nothing to notify her that it was stolen and made no efforts to retrieve it.

22. In 1989, Goffman conducted a mass-mailing promoting the Work and its availability for sale. A file-card for Circle Gallery in Goffman's own gallery indicates that it was on the mailing list and received notice that Cutler had acquired the Work and was offering it for sale.

23. On August 18, 1989, on advice by Circle Gallery that it had a customer for a Rockwell original painting, Goffman sent a photograph of the Work to its New York gallery with an information sheet setting forth the price thereof. This information was contained on a file-card maintained by Goffman as part of a card catalogue data-base of persons interested in purchasing art she offered for sale which she maintained to be used for her mailing list. The name of the contact at Circle Gallery with address and phone number is listed on the card together with action taken after the date of first contact. A penciled notation at the bottom of the card reads "8/89 Russian Classroom $225/200" indicating action taken after the initial inquiry. No one from Circle advised Goffman that

8

she was offering to sell to it a painting that had been stolen from it sixteen years earlier.

24. Upon information and belief, in October 1989, a former employee at Arts International, the Solomon owned gallery which the Work was stolen, Mary Ellen Shortland, having read in the July-August, 1989 Art and Auction magazine that the Work was being "offered by a New York gallery", "had to tell somebody". She called the Circle gallery to speak to Carol Solomon, Circle Gallery's president, and Solomon's wife, and left a message advising that Goffman had acquired the Work. Her call was not returned. A reporter, one William Stage, did the same. His call likewise was not returned.

25. Despite the knowledge by Solomon that Goffman had acquired the Work in 1988 and was offering it for sale, no one told her that the Work had been stolen from one of his galleries, nor did anyone make any effort to retrieve it until 2007.

26. Relying upon her belief that she had acquired good title to the Work and that there was no indication that the Work had been stolen, Goffman in September, 1989, sold the Work to Steven Spielberg ("Spielberg") who was a client of Goffman for a period in excess of twenty years. On May 11, 2007, Goffman reacquired title to the Work from Spielberg in exchange for another Rockwell painting of equal or greater value.

H. Goffman's First Awareness of Theft in 2006

27. Goffman first became aware of the 1973 theft of the Work when informed by the

FBI in late 2006. In early 2007 she informed the FBI that she had been reminded by a Spielberg employee that she had sold the Work to Spielberg in 1989. She immediately advised the FBI as to its newly discovered location.

28. The fact that Spielberg had acquired the Work was widely reported in the press in late February and early March 2007. Contrary to the fact that the theft of the Work was a well-kept secret held back by Solomon from the world, in general and from Goffman in particular, Solomon, after disclosure that Spielberg owned it, was reported in the press to have said that she [Goffman] "should have known better" and that "she could have checked that "there's been a record of this ever since the day it was stolen." This statement was reported in the St. Louis Riverfront Times of February 27, 2007 and upon information and belief, in other periodicals as well as other media (internet and television) throughout the United States. Solomon was also reported in the same news story to have said, "I'm sure that in two calls [to Spielberg] I could turn it over for X million dollars before the sun goes down."

I. ALR's Pursuit of Solomon's Claim of Ownership of the Work

29. On or about March 20, 2007, and thereafter, ALR advised Goffman that it represented Solomon in his claim for retrieval of the Work and threatened Goffman that if she did not settle Solomon's claim by returning the Work to him, she would suffer criminal prosecution because she had lied to the FBI, and would as well do damage to her

10

reputation. Goffman thereafter demonstrated to ALR that she did not acquire the Work by "untoward means". She showed ALR with specificity that she did not know, nor did she have reason to know, in 1988 when she acquired the Work that it had been stolen in 1973. So too, she advised ALR that from 1973 until 2005, or later, Solomon had done nothing to inform the world, in general, and Goffman, in particular, of the theft nor did he seek its retrieval even though he undoubtably knew that Goffman had acquired the Work in 1988.

30. Notwithstanding the information submitted to it, ALR pressed Goffman to arrange the return of the Work to it under the implied threat of criminal prosecution if she did not do so. For example, in order to force Goffman to succumb, ALR through its in-house counsel, wrote an E-mail to Goffman's counsel on May 2, 2007 urging that Goffman should offer a palatable resolution to the matter ... [one] that entices our client to settle without the time, cost and publicity of litigation". ALR went on and inquired, " ...are you convinced that Judy Cutler [Goffman] has been cleared of all charges in the case? Are you convinced that she has been cleared with respect to her misstatements to Federal officials?"

## FIRST COUNT
(Declaratory Judgment - plaintiff has acquired good title to the Work)

31. Plaintiff repeats and realleges paragraphs "1" through "30" as if fully set forth herein.

32. Defendants claim that plaintiff did not acquire good title to the Work

11

33. A justiciable controversy arises as to plaintiff's title which plaintiff asserts she had at the time she conveyed the Work to Spielberg, to acquire good title and to convey it to third persons.

34. Plaintiff has no adequate remedy at law and seeks a declaration that she had good title in the Work and had the right to convey such good title therein to third persons.

## SECOND COUNT
(Declaratory Judgment that Solomon is not a Real Party in Interest And thus has no interest in the Work)

35. Plaintiff repeats and realleges paragraphs "1" through "30" as if fully set forth herein.

36. Solomon's failure to abide by the requirements set forth in "11" above, caused all rights in the Work that Solomon may have possessed prior to its consignment to pass to Arts International, a division of Circle Gallery, his consignee.

37. By reason of the aforesaid, any claim of rights in the Work arising from of rights granted by Solomon's insurance carrier,bto To the extent that Solomon retained rights to repossess the Work under his insurance coverage such right vested in Arts International and was an asset in Circle Gallery's bankruptcy in 1996 and thus belonged solely to the creditors in bankruptcy.

## THIRD COUNT
(Declaratory Judgment that The Statute of Limitations of Louisiana Bars Defendants' claim)

38. Plaintiff repeats and realleges paragraphs "1" through "30" as if fully set forth herein.

39. Inasmuch as Goffman acquired the Work in the State of Louisiana, under the conflicts of law rules of the state of New York, the laws of the State of Louisiana apply to the transfer of personal property.

40. Under the provisions of Louisiana Civil Code section 3490 a person who has not been been sued for a period of three years after acquisition in good faith of personalty gains ownership of personalty. Pursuant to Louisiana Civil Code section 3491, a person who has not been sued for a period of ten years after acquisition of personalty whether or not in good faith, has acquired ownership thereof.

41. . Goffman acquired the Work in 1988. Defendants have made no claim of ownership to challenge plaintiff's claim of ownership until 2007, a period of nineteen years.

42. By reason thereof, defendants are barred from asserting a claim of title in the Work.

## FOURTH COUNT
(Intentional Tort)

43. Plaintiff repeats and realleges paragraphs "1" through "30" as if fully set forth

herein.

44. Notwithstanding Goffman's clear demonstration that she did not acquire the work in 1988 by "untoward means" and that Solomon did nothing until 2005 at the earliest to inform the public in general nor her in particular, that the Work was stolen, ALR implied to Goffman that she would suffer criminal proceedings against her for lying to "Federal authorities" as well as suffer adverse publicity if she did not return the Work to Solomon

45. ALR's conduct as aforesaid. was malicious and in the nature of extortion to compel Goffman to expend a substantial sum of money under the threat of criminal prosecution . and damage to her hard earned and well deserved reputation. Notwithstanding ALR's stance of acting in the public interest in locating stolen art and returning it to the "rightful owner" unless its purchaser was "legitimate" and had acquired the stolen art other than by "untoward means", ALR threats to Goffman were malicious and made with the full knowledge that Goffman acquired the Work not knowing that it had been stolen and that its client had lost any right he may have had in the Work by reason of his inaction for over thirty three years and that Goffman's reliance based on such inaction caused title to the Work to pass to her.

46. Solomon's statement to the press that Goffman ""should have known better" and that "she could have checked that "there's been a record of this ever since the day it was

stolen" was false and malicious and likewise intended to force Goffman to cause the Work to be returned to him, knowing full well that the theft had not been listed on any publicly available registry and that neither he nor anyone else had notified the public in general nor Goffman in particular for thirty two years that the Work had been stolen.

47.. By reason of the aforesaid, malicious conduct by defendants, Goffman has suffered special damages in that she has been required to pay legal fees and to commit to future legal fees in a sum to be determined and loss of Steven Spielberg as a client, and the profits flowing from the sale of works of art to him in the future, in the sum of no less than $5,000,000 as well as general damage to her reputation in her profession in the sum of no less than $10,000,000..

## FIFTH COUNT
(Defamation against defendant Solomon)

48. Plaintiff repeats and realleges paragraphs "1" through "30" as if fully set forth herein

49. Solomon made the statements set forth above that Goffman "should have known better" and that "she could have checked that "there's been a record of this ever since the day it was stolen" was false and Solomon knew it was false in that there was no record of the theft other than a brief news report in a local Clayton, Missouri newspaper on June 26, 1973, and was maliciously made with the intent to defame and harm Goffman in her profession.

15

50. The clear implication of the statement made to the press was that Goffman was trafficking in stolen art, and should have known that she was doing so, a criminal act. all to the damage to Goffman and to her reputation and is defamation per se.

51. By reason of the aforesaid, Goffman has been damaged in the sum of $10,000,000.

WHEREFORE, Plaintiff demands relief as follows:

1. Upon the First count a declaration that Goffman has good and proper title to the Work

2. Upon the Second Count a declaration that Solomon is not the proper claimant of title to the Work

3. Upon the Third Count a declaration that Goffman has good and proper title and Solomon is barred from making a claim of title because of the Statute of Limitations

4. Upon the Fourth Count the sum of $15,000,000

5. Upon the Fifth Count the sum of $10,000,000

together with such other and further relief as to the Court may deem just and proper.

Dated: May 17, 2007

Respectfully submitted

_____(MB3500)
MARTIN BRESSLER, ESQ.
Attorney for plaintiff
349 d Heritage Hills
Somers, NY 10589
914 669 0760